UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GREGORY MURRAY,<br><br>    Plaintiff,<br><br>    v.<br><br>WARDEN, et al.,<br><br>    Defendants. | No. 2:19-cv-2114 DAD AC P<br><br>ORDER AND FINDINGS &<br>RECOMMENDATIONS |

Plaintiff is a state prisoner proceeding pro se with a civil rights action pursuant to 42 U.S.C. § 1983. Currently before the court is defendant's motion for summary judgment. ECF No. 45.

I.   Procedural History

This case proceeds on plaintiff's first amended complaint. ECF No. 12. Upon screening, the court found that plaintiff had stated claims for relief against defendant Aung. ECF No. 15. After the close of discovery, defendant filed a motion for summary judgment (ECF No. 45), which plaintiff opposes (ECF No. 54).

II.   Plaintiff's Allegations

The first amended complaint alleges that defendant Aung violated plaintiff's rights under the Eighth Amendment. ECF No. 12. Specifically, plaintiff alleges that he suffers from inoperable brain cancer that causes excruciating headaches and that Aung is his primary care

physician. Id. at 1. Plaintiff has made numerous complaints to Aung regarding the pain he is experiencing, but she has not taken any action to treat plaintiff's excruciating and increasing pain. Id. at 1-2. In the absence of treatment from Aung, plaintiff has attempted to self-treat with over-the-counter ibuprofen and is now suffering from gastrointestinal bleeding. Id. at 2.

### III. Motion for Summary Judgment

#### A. Defendants' Arguments

Defendant argues that she is entitled to summary judgment on the ground that she was not deliberately indifferent to plaintiff's serious medical need because he did not have brain cancer and she provided treatment for his chronic headaches. ECF No. 45.

#### B. Plaintiff's Response

At the outset, the court notes that plaintiff has failed to comply with Federal Rule of Civil Procedure 56(c)(1)(A), which requires that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record." Plaintiff has also failed to file a separate document in response to defendants' statement of undisputed facts that identifies which facts are admitted and which are disputed, as required by Local Rule 260(b).

"Pro se litigants must follow the same rules of procedure that govern other litigants." King v. Atiyeh, 814 F.2d 565, 567 (9th Cir. 1987) (citation omitted), overruled on other grounds, Lacey v. Maricopa County, 693 F.3d 896, 928 (9th Cir. 2012) (en banc). However, it is well-established that district courts are to "construe liberally motion papers and pleadings filed by *pro se* inmates and should avoid applying summary judgment rules strictly." Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010). The unrepresented prisoner's choice to proceed without counsel "is less than voluntary" and they are subject to "the handicaps . . . detention necessarily imposes upon a litigant," such as "limited access to legal materials" as well as "sources of proof." Jacobsen v. Filler, 790 F.2d 1362, 1364 n.4 (9th Cir. 1986) (alteration in original) (citations and internal quotation marks omitted). Inmate litigants, therefore, should not be held to a standard of "strict literalness" with respect to the requirements of the summary judgment rule. Id. (citation omitted).

Accordingly, the court considers the record before it in its entirety despite plaintiff's failure to be in strict compliance with the applicable rules. However, only those assertions in the opposition which have evidentiary support in the record will be considered.

After plaintiff failed to respond to defendant's motion for summary judgment, he was given additional time to do so. ECF No. 53. In response to the order granting the extension, plaintiff filed a document captioned "'Summary Judgment' Request Subpoena 'Video' Pleading Courts Order for Treatment and 'Resolution,'" in which he opposes defendant's motion for summary judgment and states that he did not realize he had sixty days to file for summary judgment. ECF No. 54. To the extent the document is intended to be a cross-motion for summary judgment it should be denied because it is untimely and fails to comply with the requirements of Federal Rule of Civil Procedure 56 and Local Rule 260, which require citation to specific materials on the record and a separate statement of facts. In opposition to defendant's motion, plaintiff asserts that defendant was deliberately indifferent to his medical needs and falsified medical records. Id. at 3-6.

   C.  Legal Standards for Summary Judgment

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under summary judgment practice, "[t]he moving party initially bears the burden of proving the absence of a genuine issue of material fact." In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

"Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." Oracle

1  Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325); see also Fed. R. Civ. P. 56(c)(1)(B).
2  Indeed, summary judgment should be entered, "after adequate time for discovery and upon
3  motion, against a party who fails to make a showing sufficient to establish the existence of an
4  element essential to that party's case, and on which that party will bear the burden of proof at
5  trial." Celotex, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element
6  of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323. In such
7  a circumstance, summary judgment should "be granted so long as whatever is before the district
8  court demonstrates that the standard for the entry of summary judgment, as set forth in Rule
9  56(c), is satisfied." Id.

10         If the moving party meets its initial responsibility, the burden then shifts to the opposing
11 party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec.
12 Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). In attempting to establish the
13 existence of this factual dispute, the opposing party may not rely upon the allegations or denials
14 of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or
15 admissible discovery material, in support of its contention that the dispute exists. See Fed. R.
16 Civ. P. 56(c). The opposing party must demonstrate that the fact in contention is material, i.e., a
17 fact "that might affect the outcome of the suit under the governing law," and that the dispute is
18 genuine, i.e., "the evidence is such that a reasonable jury could return a verdict for the nonmoving
19 party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

20         In the endeavor to establish the existence of a factual dispute, the opposing party need not
21 establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual
22 dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at
23 trial." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987)
24 (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968). Thus, the
25 "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see
26 whether there is a genuine need for trial." Matsushita, 475 U.S. at 587 (citation and internal
27 quotation marks omitted).
28 ////

"In evaluating the evidence to determine whether there is a genuine issue of fact, [the court] draw[s] all inferences supported by the evidence in favor of the non-moving party." Walls v. Cent. Contra Costa Transit Auth., 653 F.3d 963, 966 (9th Cir. 2011) (citation omitted). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586 (citations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Id. at 587 (quoting First Nat'l Bank, 391 U.S. at 289).

Defendants simultaneously served plaintiff with notice of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure along with their motion for summary judgment. ECF No. 45-5; see Klingele v. Eikenberry, 849 F.2d 409, 411 (9th Cir. 1988) (pro se prisoners must be provided with notice of the requirements for summary judgment); Rand v. Rowland, 154 F.3d 952, 960 (9th Cir. 1998) (en banc) (movant may provide notice).

        D.      <u>Legal Standard for Deliberate Indifference to a Serious Medical Need</u>

"[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate must show 'deliberate indifference to serious medical needs.'" Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)). This requires plaintiff to show (1) "a 'serious medical need' by demonstrating that 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain,'" and (2) "the defendant's response to the need was deliberately indifferent." Id. (some internal quotation marks omitted) (quoting McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992)).

Deliberate indifference is a very strict standard. It is "more than mere negligence." Farmer v. Brennan, 511 U.S. 825, 835 (1994). Even civil recklessness—failure "to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known"—is insufficient to establish an Eighth Amendment claim. Id. at 836-37 (citation omitted). A prison official will be found liable under the Eighth Amendment when "the official

5

knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837. A plaintiff can establish deliberate indifference "by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." Jett, 439 F.3d at 1096 (citing McGuckin, 974 F.2d at 1060).

A difference of opinion between an inmate and prison medical personnel—or between medical professionals—regarding the appropriate course of treatment does not by itself amount to deliberate indifference to serious medical needs. Toguchi v. Chung, 391 F.3d 1051, 1058 (9th Cir. 2004); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989). To establish that a difference of opinion rises to the level of deliberate indifference, plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances." Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996) (citation omitted).

### E. Evidentiary Issues

Defendant has produced a limited number of plaintiff's medical records in support of her motion for summary judgment, none of which have been authenticated. ECF No. 45-3 at 37-54, 63. Plaintiff has also produced unauthenticated portions of his medical records in support of various motions on the docket and with his opposition to the motion for summary judgment. See ECF No. 1, 13, 20, 25, 42, 44, 54. However, "[a]t the summary judgment stage, [the court does] not focus on the admissibility of the evidence's form. [It] instead focus[es] on the admissibility of its contents." Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003) (citations omitted). In other words, the court can consider the evidence if its contents could be presented in an admissible form at trial. Fraser, 342 F.3d at 1037. Since plaintiff's medical records could be made admissible at trial with proper authentication, the court will consider the records before it to the extent their authenticity and accuracy has not been challenged.

With respect to defendant's declaration, the court will consider only those portions of the declaration that are based upon defendant's personal knowledge and will not consider portions that address treatment by other physicians unless corresponding medical records have been

produced on the record. Grievance responses summarizing plaintiff's medical records (see ECF No. 45-3 at 23-25) are not sufficient to establish the medical treatment plaintiff received.

### F. Undisputed Material Facts

Plaintiff did not separately respond to Defendant's Statement of Undisputed Facts (DSUF), and the facts are therefore deemed undisputed except as otherwise discussed. Additional facts have been taken from plaintiff's medical records as appropriate.

At all times relevant to the complaint, plaintiff was an inmate at Mule Creek State Prison (MCSP). DSUF (ECF No. 45-4) ¶ 1. At all relevant times, defendant was a physician and surgeon employed at MCSP. Aung Decl. (ECF No. 45-2) ¶ 2.

In 2010,[1] plaintiff was diagnosed with a cranial meningioma (brain tumor). DSUF ¶ 3. Plaintiff does not and has not ever had cancer. DSUF ¶¶ 4-5. The records indicate that in 2011, plaintiff saw Dr. Patel, to whom he reported that he was managing his pain by taking Vicodin four to five times a day. ECF No. 20 at 13. Dr. Patel advised plaintiff that the treatment of choice would be surgical removal, but plaintiff was hesitant to consent to surgery. Id.; ECF No. 25 at 26.

On January 3, 2017, plaintiff was seen by Dr. McDermott, a neurosurgeon, who noted that "surgery would not guarantee complete relief of his headache syndrome." ECF No. 25 at 20. Dr. McDermott noted that his "approach would be that if nonnarcotic options have been exhausted and the patient has subjective complaints of pain and [sic] some form of narcotic medication should be used either on a regular basis or for breakthrough pain." Id. He further noted that "if nonnarcotic medications are not controlling [plaintiff's] pain that narcotic medications may be a temporary solution" and that he advised plaintiff that "chronic narcotic medications for pain management alone never leads anything [sic] good." Id. Dr. McDermott's recommendations were surgical treatment and "[n]on-narcotic and narcotic analgesia as required for pain control." Id.

---

[1] Although DSUF ¶ 3 states that plaintiff was diagnosed in 2011, this appears to be a typographical error as the records cited and plaintiff's opposition all state that the diagnosis occurred in 2010. ECF No. 45-3 at 37; ECF No. 54 at 2.

On August 7, 2017, Dr. saw plaintiff for his chronic headaches and noted that plaintiff reported taking morphine IR 15mg three times a day. ECF No. 45-3. Dr. Reda noted that plaintiff stated he was not interested in surgery for his tumor because "he was told he would be left with significant deficits" and that he was adjusting plaintiff's medication to extended-release morphine twice a day. Id.

In July 2018, defendant Aung was assigned as plaintiff's primary care physician. DSUF ¶ 17. At the time, plaintiff's morphine prescription had already been discontinued and he was prescribed one tablet of Tylenol 3 per day. DSUF ¶¶ 16, 18. Due to plaintiff's apparent withdrawal symptoms from being tapered off of morphine and eventually Tylenol 3, defendant increased plaintiff's Tylenol 3 regimen to one table twice per day. DSUF ¶ 19. At the time defendant was providing treatment for plaintiff, prescribing morphine for his condition was prohibited. DSUF ¶ 20; Aung Decl. ¶ 15.

On August 6, 2018, plaintiff was seen by Dr. Senegor, who noted that plaintiff's "headaches were under control until recently with pain medication. The [sic] presently out of control because of the pain medication is [sic] been discontinued." ECF No. 1 at 5. He further noted Dr. McDermott's opinion that surgery was not necessarily needed if plaintiff's pain was under control and that plaintiff "is not terribly interested in surgery if his pain is under control." Id. Dr. Senegor assessed that if plaintiff's "pain management is reinstituted and headaches, under control, presently there would be no need for any surgery. If headaches remain out of control surgery becomes a consideration." Id.

On January 30, 2019, plaintiff was seen by a neurosurgery clinic for his meningioma. ECF No. 25 at 21. They noted that plaintiff had been weaned off narcotics a few months prior and that "his current pain regimen includes tylenol #3 BID and ibuprofen ATC (approx. 4g/day per pt). Id. The records further note that plaintiff's headaches were

> uncontrolled on current pain regimen, and it should be changed to his previously working regiment. Surgery is an option for this patient but would be risky, it is reasonable to not have the surgery at this time and instead optimize pain control. He should also have neurology follow up to determine if there is another source for these

////

8

> H/As. Pt should follow up in NSGY clinic here with Dr. Riordan in 3 months . . . .

Id.

On May 24, 2019, plaintiff was seen at the neurosurgery clinic by Dr. Riordan, who explained that his headaches were not likely related to the tumor and recommended a referral to neurology to discuss headache management, with a follow-up in ten months. Id. at 22. Dr. Riordan further noted that she "would nto [sic] recommend treating chronic headaches with narcotics." Id. Following Dr. Riordan's recommendations, defendant continued plaintiff on his current medication regimen, which excluded morphine. DSUF ¶ 22.

On June 3, 2019, plaintiff was seen by defendant. ECF No. 45-3 at 53. The record indicates that she reviewed records from plaintiff's appointments with Dr. McDermott, Dr. Senegor, and Dr. Riordan, and noted that plaintiff's headaches had been controlled since increasing the dose of Tylenol 3. Id. The records note that plaintiff was prescribed two Tylenol 3 three times a day and 400 mg of ibuprofen twice a day as needed, and that "[p]revious provider discussed about this case in pain management committee in 2018, decided not for narcotics for headache." Id.

On August 28, 2019, plaintiff was seen by Dr. Park, a neurologist. Id. at 49. The records indicate that plaintiff was taking two Tylenol 3 tablets three times a day and 800 mg of ibuprofen twice a day. Id. Dr. Park noted that plaintiff's headaches were likely not due to his meningioma, but that it could not be entirely ruled out as the cause. Id. at 50. Dr. Park further noted that she strongly recommended preventative therapy "given frequent headaches and extensive use of daily analgesics." Id. She "discussed antidepressant class of medications, antihypertensive class of medications, antiepileptic class of medications that have shown to be effective in headache prevention" and explained that the goal was "to lower the overall severity and frequency of his headaches with goal of slowly reducing the use of daily analgesics." Id. at 50-51. She noted that plaintiff "perseverated on not changing his current regimen of Tylenol #3, and subsequently stated perseverate on being treated with narcotics which he believes was recommended by one of the neurosurgeons he previously saw." Id. at 51. Dr. Park explained that opiates were "not an

appropriate first-line agent for his chronic daily headaches and shared [her] concerns about the long-term risks." Id.  In the event plaintiff became interested in preventative therapy, she recommended several medications and that Botox therapy, which was brought up by plaintiff, could be an option if two or more of the preventative medications failed.  Id.

In September 2019, plaintiff was once again referred to the pain management committee, who recommended that plaintiff's Tylenol 3 be discontinued and recommended alternative, non-narcotic medication, such as nortriptyline and verapamil, which are both used to treat migraines and cluster headaches.  Aung Decl. ¶ 19; DSUF ¶ 23.  On September 5, 2019, defendant advised plaintiff of the committee's recommendation and plaintiff refused to take the non-narcotic medication recommended.  Aung Decl. ¶ 20; DSUF ¶ 24.  As a result, defendant reduced plaintiff's Tylenol 3 regimen to one tablet, three times per day and prescribed Cymbalta, an anti-depressant that is also recommended to treat chronic pain, and sixty ibuprofen per month.  Id.  Defendant informed plaintiff that taking more than the prescribed amount of ibuprofen could lead to gastrointestinal issues.  DSUF ¶ 26.  Plaintiff took ibuprofen in amounts significantly exceeding the prescribed amount.  DSUF ¶ 27.

On March 6, 2020, defendant was contacted by a social worker requesting that she follow up with plaintiff regarding a referral to the MAT program.  ECF No. 25 at 31.  Defendant responded two days later that the request was noted.  Id.  On June 3, 2020, plaintiff was seen by Dr. Ashe for an initial consultation for the MAT program.  Id. at 30.  Dr. Ashe noted Dr. McDermott's report, that plaintiff had "a history of chronic opioid use due to chronic headaches," and that plaintiff had most recently been treated with Tylenol 3.  Id.  The records reflect that plaintiff was prescribed two Tylenol 3 three times a day.  Id.

The records indicate that on September 24, 2020, plaintiff was seen by Dr. Rahimifar for a telephonic consultation and noted that "the latest neurosurgical opinion was that this is a high risk surgery" and that plaintiff's meningioma would need to be watched very closely if he did not want to accept the risks and complications of surgery.  ECF No. 13 at 3.  Plaintiff asserts that this record has been falsified because his consultation was cancelled and he was sent back to his cell without going to the appointment.  ECF No. 54 at 6; ECF No. 57 at 2.

On October 19, 2020, plaintiff was seen by at a neurosurgery clinic,[2] and it was noted that he reported that "his current pain regimen of Tylenol #3, 6 times a day is not giving him any significant relief" and recommended a follow-up with neurology for management of his chronic headaches and a referral to pain management. ECF No. 25 at 23. He was to return in March 2021. Id.

On March 22, 2021, plaintiff was seen for a follow-up at the neurosurgery clinic with Dr. Riordan who noted that he was "minimally verbal" and would "not answer questions about his chronic headaches, only states that due to 'our recommendations' he is not on pain medications." Id. at 24. Dr. Riordan explained that they did not make recommendations about headache management and noted that plaintiff "refuses to answer any further questions, only asks about embolization." Id. The records note that plaintiff was taking Tylenol 3 "2 tablets by mouth every 4 (four) hours if needed for moderate pain. 2 tablets TID." Id.

On April 21, 2021, plaintiff was seen by Dr. Bai regarding his chronic, severe headaches. ECF No. 42 at 5. The records reflect that plaintiff reported his meningioma was discovered in 2010 and "has been treated conservatively with medication." Id. Plaintiff also reported that he was previously given opioid medication for his headaches but that had stopped, that his headaches were uncontrolled, and that a neurologist he saw in 2018 recommended Botox injection and amitriptyline, but that "he did not want to take amitriptyline or other psyche [sic] medications." Id. Dr. Bai noted that plaintiff "has severe headache and wanted to have control and especially he wanted to the [sic] opioid medication control the headache." Id. at 6. Dr. Bai recommended that plaintiff be seen by a university medical center headache clinic due to the complexity of his case, and because plaintiff had a severe headache, plaintiff was offered an occipital nerve block to see if that would relieve the headache temporarily. Id. Plaintiff accepted the occipital nerve block and the procedure was completed at the appointment. Id.

On May 18, 2021, plaintiff was seen by Dr. Ashe for a follow-up on his headaches. The records state that plaintiff "was started on venlafaxine at last appt. He has continued on an

---

[2] The notes are signed by both a physician's assistant and Dr. Riordan (ECF No. 25 at 23), though plaintiff asserts that he was seen only by the physician's assistant (ECF No. 13 at 5).

evening dose of valproic acid only per patient request" and that he was "tolerating the addition of the venlafaxine however the valproic acid continues to make him feel tired." ECF No. 44 at 11. Plaintiff also reported that he had "not noticed any significant changes in his headaches and has found that the occipital injections were the most helpful but the effects are gradually starting to wear off." Id. The record also reflects that plaintiff was seen by neurology on May 14, 2021, and that the neurologist "noted that he 'agree with Dr. Parks (Neurology) 8/19 report" and that there were no new recommendations of follow up recommendations provided. Id. Dr. Ashe also noted that plaintiff "has been referred back to Neurosurgery, initially requesting Dr. McDermott, his previous provider, at UCSF. The provider is no longer available but UCSF has agree to see IP Murray" and that, as requested, an MRI had been ordered prior to the appointment being scheduled. Id.

On July 28, 2021, plaintiff was seen by Dr. Bai, who noted that plaintiff was requesting a repeat occipital nerve block because it "helped a significant amount." Id. at 15. Plaintiff also reported that "he does not want opioid medication for his headaches" and Dr. Bai repeated the recommendations that plaintiff be referred to a headache clinic." Id. at 16. Dr. Bai performed an occipital nerve block at the appointment. Id.

After October 2021, defendant was no longer plaintiff's primary care physician. Aung Decl. ¶ 3.

Due to plaintiff's ongoing complaints of pain, he was enrolled in MCSP's Chronic Care Program where his medical conditions and medication needs were closely monitored by a team of physicians, both inside and outside of the California Department of Corrections and Rehabilitation (CDCR). DSUF ¶ 10. With respect to complaints of pain and long-term pain management, MCSP has an onsite Pain Management Committee made up of a group of physicians, including the Chief Physician and Surgeon at MCSP, that confers regarding best treatment and makes all decisions regarding a particular course of treatment. DSUF ¶ 11.

The CDCR has strict rules regarding prescribing opioids and narcotics, such as morphine, and mandates that morphine only be prescribed for acute, short-term injuries, or palliative care, such as cancer-related pains or hospice care. DSUF ¶ 12. Morphine is prohibited to treat chronic,

non-cancer maladies.  Id.  These rules were adopted by the CDCR to mirror guidance issued by the United States Center for Disease Control and Preventions for Prescribing Opioids for Chronic Pain.  DSUF ¶ 13.  Due to the highly addictive nature of opioids, long-term health risks, and minimal rehabilitative impact, opioid therapy is disfavored to treat chronic, long-term conditions unless and until that condition becomes terminal.  DSUF ¶ 14.  The known side effects of long-term morphine use include heart failure, respiratory problems, and depression.  Id.

### G. Discussion

In his opposition, plaintiff argues that when his morphine regimen was discontinued at Valley State Prison in 2016, it was reinstated on the recommendation of Dr. McDermott.  ECF No. 54 at 2.  However, shortly after he was transferred to MCSP, his morphine regimen was discontinued again without a replacement and when he submitted a grievance in spring of 2018, he requested reinstatement of his morphine prescription "'until' the issue be coordinated by a pain specialist."  Id.  He asserts that "[s]ince the starting grievance 2018, plaintiff has been left to suffer without adequate pain treatments to the point of gastrointestinal bleeding, from excessive use of NSAIDS."  Id. at 2-3.  He further argues that "[d]efendants have displayed blatant abuse of 'Hippocratic oath' as well as 'falsified medical records,'" that healthcare providers "disregard the treatment plans and recommendations from [off-site] specialists," and that he has been "labeled an opioid/narcotic seeker."  Id. at 3-4.

It is undisputed that plaintiff suffered from chronic, severe headaches and that he was, at one time, prescribed morphine to control the pain.  It is also undisputed that plaintiff's prescription for morphine was discontinued prior to defendant taking over as plaintiff's primary care physician.  Though plaintiff appears to argue that defendant should have temporarily reinstated his morphine prescription, he provides no evidence that she was authorized to do so.  Defendant, on the other hand, produced evidence that she was not permitted to prescribe morphine because plaintiff's meningioma, which may or may not be the cause of the headaches, is not cancerous and the Pain Management Committee determined that narcotic pain medication was not appropriate for plaintiff's headaches.

////

Plaintiff appears to argue that the treatment he received once his morphine was discontinued was clearly deficient because his only option was to self-medicate with excessive ibuprofen despite the potential side effects. ECF No. 54 at 2-3. However, despite defendant's inability to prescribe morphine, the record establishes that during the time defendant was plaintiff's primary care physician, plaintiff was seen by various doctors, including specialists; his pain medications were adjusted; he was offered and refused to try psych medications as an alternative pain management option; and he was offered and refused to try medications aimed at headache prevention. While plaintiff is certainly free to refuse specific medications or types of medication, he does not have a right to dictate what medications he will be prescribed, and he cannot claim that he was left no other option but to self-medicate when he declined to try other viable alternatives offered. See Stiltner v. Rhay, 371 F.2d 420, 421 n.3 (9th Cir. 1967) ("[P]laintiff's allegations show only that he has not been receiving the kind and quality of medical treatment he believes is indicated. Like the Seventh Circuit, 'we know of no authority standing for the proposition that such a claim as plaintiff attempts to assert here is cognizable under the Federal Civil Rights Act.'" (quoting United States ex rel. Lawrence v. Ragen, 323 F.2d 410, 412 (7th Cir. 1963))).

To the extent plaintiff argues that his medical records have been falsified (ECF No. 54 at 3-4), the medical records relied on by the court were provided almost entirely by plaintiff in support of various motions, and he identifies only the September 24, 2020 telemedicine consult as fabricated (id. at 6). To the extent plaintiff disagrees with a doctor's recommendations or believes it contradicts another doctor's recommendations (id. at 5-6), a difference of opinion between an inmate and prison medical personnel—or between medical professionals—regarding the appropriate course of treatment does not by itself amount to deliberate indifference to serious medical needs, Toguchi, 391 F.3d at 1058; Sanchez, 891 F.2d at 242.

Ultimately, although there are gaps in the evidentiary record regarding plaintiff's care, he fails to identify any specific instances during those times where he requested treatment from defendant and was denied or ignored, and he has not produced any evidence showing that defendant failed to provide him with treatment for his chronic headaches. Instead, plaintiff makes

only general assertions that "defendants"[3] have failed to provide him with adequate treatment, which is not sufficient to overcome defendant's motion for summary judgment. See F.T.C. v. Publ'g Clearing House, Inc., 104 F.3d 1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact." (citations omitted)).

### H. Conclusion

As set forth above, the undisputed evidence demonstrates that defendant was not deliberately indifferent to plaintiff's serious medical need and defendant's motion for summary judgment should be granted.

## IV. Motions for Appointment of Counsel

Plaintiff has requested the appointment of counsel. ECF No. 60, 61. The United States Supreme Court has ruled that district courts lack authority to require counsel to represent indigent prisoners in § 1983 cases. Mallard v. United States Dist. Court, 490 U.S. 296, 298 (1989). In certain exceptional circumstances, the district court may request the voluntary assistance of counsel pursuant to 28 U.S.C. § 1915(e)(1). Terrell v. Brewer, 935 F.2d 1015, 1017 (9th Cir. 1991); Wood v. Housewright, 900 F.2d 1332, 1335-36 (9th Cir. 1990).

"When determining whether 'exceptional circumstances' exist, a court must consider 'the likelihood of success on the merits as well as the ability of the [plaintiff] to articulate his claims pro se in light of the complexity of the legal issues involved.'" Palmer v. Valdez, 560 F.3d 965, 970 (9th Cir. 2009) (quoting Weygandt v. Look, 718 F.2d 952, 954 (9th Cir. 1983)). The burden of demonstrating exceptional circumstances is on the plaintiff. Id. Circumstances common to most prisoners, such as lack of legal education and limited law library access, do not establish exceptional circumstances that would warrant a request for voluntary assistance of counsel.

In light of the recommendation that defendant's motion for summary judgment be granted, plaintiff's motions for counsel will be denied because he is unable to demonstrate a likelihood of success on the merits.

---

[3] Defendant Aung is the only defendant in this case.

15

V.  Plain Language Summary of this Order for a Pro Se Litigant

The undisputed evidence shows that Dr. Aung provided you with treatment for your headaches during the time that she was responsible for your care. The fact that the treatment was not as effective as your previous pain regimen does not mean that she violated your constitutional rights. Dr. Aung was not allowed to prescribe morphine for your condition, so her failure to do so wasn't deliberately indifferent.

CONCLUSION

Accordingly, IT IS HEREBY ORDERED that plaintiff's motions for appointment of counsel (ECF No. 60, 61) are DENIED.

IT IS FURTHER RECOMMENDED that:

1. Plaintiff's motion for summary judgment (ECF No. 54) be DENIED;
2. Defendant's motion for summary judgment (ECF No. 45) be GRANTED;
3. Judgment be entered for defendant; and
4. The Clerk of the Court be directed to close this case.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be served and filed within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: October 3, 2022

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE